161945 United States v. Gregory Owens. Thank you. Good morning Chief Judge Howard, Judge Thompson, Judge Torrella. May it please the court. My name is Sarah Churchill and I represent the appellant Gregory Owens in this matter. Chief Judge Howard, may I please reserve one minute for rebuttal? Yes. On December 18th of 2014, a gloved and masked intruder broke into the home of Stephen Carroll Shabbat in Saco, Maine. The intruder gained entry to their home through an exterior door to the garage on the back of the home that contained nine glass panels. In some manner, the intruder broke the glass, entered the garage, and then entered a secondary door into the proper part of the Shabbat's home. The intruder made their way up the stairs. Carroll Shabbat had heard a noise, glass breaking, on the rear door. And she had exited the master bedroom, crossed the top of the stairs, and looked into where a guest of the Shabbat's, Rachel Owens, had been sleeping in a spare bedroom. Seeing that nothing was wrong with Mrs. Owens at that time, Ms. Shabbat proceeded to head back towards the master bedroom where she encountered her husband who had a look of horror on her face. The mere look on her husband's face sent her fleeing into a second spare bedroom that was behind her. The intruder finished coming up the stairs and headed directly to the room that Mrs. Shabbat had taken refuge in. She had managed to block the door with a chair from a desk that was inside that bedroom and hidden beneath the desk. The intruder proceeded to try to kick the door in, leaving footprints on the door itself. Being unsuccessful... You know, we're familiar with the facts. What? We're familiar with the facts if you wanted to move on to your argument. Certainly. Mr. Owens, at the time, this event occurred as a resident of Londonderry, New Hampshire, and law enforcement specifically focused on him from the outset. They sent law enforcement in Maine, contacted law enforcement in New Hampshire, and asked that law enforcement officers be sent to the Owens home on Whitford Drive in Londonderry to see if Mr. Owens was home. Local law enforcement in New Hampshire was instructed that under no circumstance were they to make contact directly with Mr. Owens. Law enforcement parked at the end of Winthrop Drive and made their way quietly in the cover of night, up Winthrop Drive, across Mr. Owens' lawn, into the driveway of his home. They specifically chose that route and chose to park their vehicle at the end of the road so as not to be seen and detected. Again, their purpose was to see if Mr. Owens was home and not to make contact with him to tell him what had happened to his wife. A law enforcement officer, Officer Dyer, approached across the yard into the driveway of the Owens home and touched the hood of the vehicle. The defense maintains that that was a trespass upon Mr. Owens' property, that the officer entered into the curtilage of Mr. Owens' home and performed an unlawful search of the hood of the vehicle when he touched it to check the temperature of the hood of the vehicle. Did you say that was December 18th? December 18th of 2014, yes, sir. That's pretty cold, isn't it? The testimony in the record was that it was approximately 30 degrees with a light rain falling at the time, so yes, it was cold on that particular evening and the road was wet. So if they had waited and gone to get a search warrant, the chances are that the car would have cooled off, wouldn't it? Isn't that the case? There is certainly that potential, although I think the testimony in the record was clear that the purpose of approaching the home initially was to see if Mr. Owens was home. I believe the testimony was that checking the hood was an afterthought. I don't believe that was the primary purpose. Does that make any difference to your argument? I believe it does, Your Honor. In other words, if they discovered a crime as an afterthought, it would still not be possible for them to use that? A crime as an afterthought, potentially, but this wasn't a crime that was discovered as they made their way across the neighborhood. Evidence. Evidence. Certainly it was evidence. The fact that Mr. Owens' vehicle was warm was certainly evidence that was used against him. It's listed all through the search warrant affidavits that was introduced at trial to show that he had been out and about, away from his home on the morning in question. And that's why you're raising the issue of the cartilages, is it? That is exactly why, because we believe that information was prejudicial to Mr. Owens. Well, what I'm obviously driving at is, didn't they have exigent circumstances to go ahead in without a search warrant because of the fact that the evidence would be destroyed if they waited? No, Your Honor, I don't believe so. And the reason I say that is in part because of the timing of how this all unfolded on the morning in question. The 911 call came in at just before 3 a.m. Law enforcement in Maine made contact with law enforcement in New Hampshire at approximately 4.15 or 4.20 in the morning. It was not until over an hour later that the officers approached Mr. Owens' home. So to the extent they believed he was a suspect and they wanted to search his vehicle, they had ample time during which to get a warrant. So the exigency that you talk of is not as critical in this particular case as it may have been. It wasn't discovered by accident. They didn't stumble on Mr. Owens' home by accident. They had ample time at which to plan their approach to the house and gain the search warrant that you speak of. Well, let's leave that for a minute. Why do you say this is part of the curtilage? I have photographs here that don't show anything that this area is surrounded by a fence or anything like that. They don't, Your Honor. And as the Court is well aware in Dunn, the Supreme Court articulated four particular factors to look at in terms of assisting the Court in determining whether or not a particular place is curtilage. However, the Court in Dunn clearly said that those are not the only four issues that can be looked at and that the overarching issue is how intimately the area to be searched or to be accessed is tied to the home itself. Here, the area where the vehicle was parked was approximately 10 feet or so from the actual garage door, which is in the driveway. In the driveway. In the driveway, correct. On a dead-end street, you can also see from the pictures, particularly the one on page 2812 of the appendix What's the number of the exhibit? That, I believe, is exhibit number, marked Defense Exhibit 4. It's page 2812. You see in front of the home, in the area that comes up the street, so if you're coming up the street, it's on the left, there are tall trees and bushes that are prior to Mr. Owen's mailbox that block the view of the home itself. Officer Dyer also testified he specifically made the approach he did because he could use those trees and bushes as cover and they would protect him from being seen from the front door. Additionally, the fact that it's a dead-end street is also a fact that the court, I believe, failed to place enough faith and take into consideration in an appropriate manner in this case. The fact that it's a dead-end street protects it from being regularly viewed by the public. There's no fence around the property. That's absolutely correct. Not only that, but I mean, I have a photograph here of Exhibit 3 and you can just walk in from the, you can just walk, would you like to see it? No, I'm familiar with the photo you're talking about, sir. You can just walk in from the road. You absolutely can, Your Honor, but you could also walk into Mr. Collins' driveway in the recent Supreme Court case, Collins v. Virginia, in order to access the motorcycle that was searched by law enforcement in that case. In that case, the vehicle that was searched was plainly visible to the officer even though it was underneath a structure attached to the garage. That makes a difference. It did make a difference, but it was an open structure and the officer could plainly view the vehicle from the street. Well, there's no structure here. There is not. There is not a structure there. That's absolutely correct. Counselor, I'm sorry, even if there was error, there's still an abundance of other evidence, particularly the DNA evidence, the boot print. I mean, there's just the cut on his hand, the blood in the car, his DNA specifically in the garage where the entry occurred. So in the end, I mean, why isn't it just harmless error? So we would submit it's not harmless error for a number of reasons. First, that information regarding the search that occurred in the driveway was used in multiple search warrants that were signed to allow law enforcement to search Mr. Owen's car, which found the take a DNA sample from him that was compared with DNA that was found in the garage area. However, there was also evidence introduced that Mr. Owens had been to the Chabot's home before. He and Rachel Owens had been friends of theirs and they had visited that home. So the fact that his DNA was present in the home in and of itself, I would submit has less significance in this particular case than it may in some other cases. The search warrant affidavits that the information about the temperature of the motor vehicle was used in was also used to access his computer. So there's a significant amount of taint to the other evidence that flows from that initial search. The fact that the other information was introduced at trial, again, I think relates back to that initial prejudice, Your Honor. One quick, my assumption is that you've abandoned the double jeopardy argument? I think that that's a fair assumption, Your Honor. The fact of the matter is the other case that was pending in State Court was subsequently dismissed and is no longer pending and didn't result in a conviction. Thank you. May it please the Court, John Palateri on behalf of the United States. I'd just like to touch on something that Judge Thompson mentioned, which is the harmless error analysis. Even if you were to assume that the entry onto Mr. Owens' driveway and the touch of the vehicle somehow violated his Fourth Amendment rights, we don't think that the entry and the touch did. But even if you were to assume that, any error was harmless. There would be two implications for if you were to assume that there was a constitutional violation. Number one, you'd have to excise that allegation of the warmth of the car from the warrant affidavits and determine whether there was probable cause without that allegation. And number two, you'd have to determine whether admission of the evidence about the warmth of the car at trial somehow affected the outcome of the trial. And on both scores, the answer is no. There was ample allegations in the affidavit that established probable cause for the search even without touching the warmth of the car. There was the fact that the home owner, Mr. Owens, his wife, there were two videos showing the defendant in dark clothing at I believe around 12.15 and 4.50 with ample time to go to and from Saco, Maine, to where the intrusion occurred and the attempted murder occurred. And in those videos, the defendant is wearing dark clothing, which is consistent with the eyewitnesses at the scene of the attempted murder. There's Mr. Owens had said that he, that he was, that he was wearing that he had nine millimeter firearms. And in fact, he said that he had driven to, and it was undisputed that he had driven to the, um, the Dunkin Donuts at 4.50 PM. So the car would have been warm no matter what. And it was undisputed that he had actually been out and about. The purpose of the notion that the car was warm to establish that was to establish that Mr. Owens had been out and about. And he conceded that he was in his interview and he doesn't dispute it now. And there's a video of him showing him that he's been out and about. So even if you were to assume that there was any kind of constitutional intrusion, Fourth Amendment intrusion, at the time of the entry onto the garage, onto the driveway and the touch of the vehicle, any error was harmless. If the court has any additional questions, I'd be happy to answer them. I've got one. The conviction under 18 U.S.C. 2261, 81 and B2, according to my wonderful law clerks, it requires that the defendant cause the victim to travel in interstate commerce by force, coercion, duress or fraud. And I'm trying to figure out how that element was used. I believe that under 2261A1, a person who travels in interstate or foreign commerce or enters or leaves Indian country or is present within a special amount of time, jurisdiction of the United States, with the intent to kill, injure, harass or intimidate a spouse, intimate partner or dating partner, and who in the course or as a result of the travel commits or attempts to commit a crime of violence against that spouse, shall be punished as provided in Section B, Your Honor. So A1 doesn't require anything about the victim. So it's the defendant who needs to travel in interstate commerce? Under A1, that is correct, Your Honor. I believe that that's, that was the offense of eviction. And I believe that that would be the element. Yes, he was charged in violation of A1 and B2. So, going back to the touching the hood of the car, after the officer did that, that officer then retreated back to the cruiser? I believe that's what happened, Your Honor. And then what happened? I believe he called in the information and then when they saw Mr. Owens leave the house So they stayed there and kept him under surveillance? I'm not positive, Your Honor. I would need to confirm, but I believe that's the case, yes. So I believe that they went back to a, I believe they were stationed at the end of the street. Someone went up, touched the vehicle, went back there, and then after he left, I think they followed him to the Dunkin' Donuts. To the Circle K? To the Circle K, yes. The Circle K was at 1215, Dunkin' Donuts, 450, and then the Circle K, which has the Dunkin' Donuts in it, at around 6 o'clock. Right. Yes. Why wouldn't the driveway be part of the curtilage? Why wouldn't you have an expectation of privacy in your own driveway? Well, I think that it varies. There are different types of driveways in different situations, and it's all a context-driven analysis. So, for example, in Collins, you had a driveway that traveled up past the front perimeter of the house, and the area that was past the front perimeter had walls around it on two sides, and then on the third side was the house, plus an entry into and out of the house. So there was protection against public viewing, and it was, and the area that went up to the part of the driveway that connected to the front walkway was prior to that area that had been enclosed. So that's a very different situation from a driveway where you have a short driveway that has, and you're parked in the area or in the area that one must go through in order to get to the front steps. So there's going to be people in and out. There's an expectation that people will walk through that area. It's perfectly viewable from the street. There's nothing protecting it. And that is very different from the Collins situation. So I think that there are situations where a driveway is part of the curtilage. Here, all the factors, all the context in this case. Well, isn't there a Supreme Court case law requiring that in order to have an expectation of privacy that I have to put a fence around my yard? No, you're absolutely right, Your Honor. A fence is not required. It's one factor to take into consideration. Whether there's the proximity to the house, there's the, whether there's any, whether the area is within a fenced area that includes the house, there's the uses to which the area is put. And there's any efforts to protect it from the public. So that could be a sign. It could be bushes. It could be trees. Anything that protects that area from the public. And all of those factors here. So there was, there was nature protection on three sides of the house. And the only area, and it was at the end of a dead-end street. So the only area that was visible was the front area. And you're saying that in order to have more protection, they had to do more. Well, there were a few trees. More treatment protection. There were a few trees around the side of the house that brought the view from that area. But if you're, any member of the public walking down the street sees the driveway right there. In fact, the neighbor right across the street, looking out the front door, can see the driveway right there. There's no, nothing's protecting it. There's nothing, there's nothing suggesting that that is an intimate part of the house. That's really the inquiry for Kurtowich. Is this really part of the house, part of the usage of the And here, it's a driveway that's out and open to the public. Anyone standing on the street sees it. Neighbors see it. You have to walk into that area to get to the front door, which, so there would be the expectation that people would walk through that area on a regular basis. I couldn't tell from the photograph, but was there a separate walkway to approach the door? No, that's the walkway, I believe. My recollection of the evidence is that that is the walkway to approach the front door is through the driveway. And so one would expect that people, members of the public are going to go into that area. And there's nothing saying, don't come on my property, don't come here. No signs, no bushes, no, nothing that protects that, protects the public from viewing it, from walking onto it. So if there was a separate walkway to approach the door, would that be a different case? It certainly would be a factor to consider. I don't know if that would touch the weight one way or the other. But it certainly would be something for the district court to consider. And among the numerous factors, the totality of the circumstances, weighing the different done factors, the four done factors in the particular circumstances of this case, again, that wasn't here. And all the factors, we believe the district court got it correctly and determined that there wasn't cartilage. But again, even if you assume that it was cartilage and that there was a Fourth Amendment intrusion, again, we also believe that there was exigency, which is an exception to the warrant requirement. But even if you conclude that this or assume that this was cartilage and there was no exigency, any error was harmless because there were ample allegations in all the affidavits that established probable cause, even without the notion that the car was warm to the touch, including the video showing that he had just been out and about previous to the touching. And there was ample evidence, really overwhelming evidence at trial, regardless of whether this notion of touching the car and it being warm was introduced. Thank you, Your Honors. Thank you. Just briefly, to address your point, Chief Judge Howard, about what happened after Officer Dyer retreated from the property, he returned to the end of Winthrop Drive at the station area, exchanged information back with his commanding officers who told Maine what had been found out during his viewing of the home and his touching of the car, and then a plan was hatched basically for them to stay at the end of the street and see what happened next. Mr. Owens eventually leaves his home at approximately 6 a.m., heads towards the local Circle K with the Dunkin' Donuts in it, to be confused with the other ones we've discussed. And the determination is made from Maine at that time. They tell New Hampshire, go ahead and stop him and let's see what he has to say. And with regard, Judge Thompson, to your point about how you accessed the front of the home, if you look at, and I think it's the photograph on page 2812 of the appendix, you see the driveway at the front of the home with an evidence collection vehicle parked in it. There is a walkway after you take a couple of steps into the driveway that bears off to the right up to the front door, and then there's additional space in the driveway in which the car in question was parked heading up to the house. So you don't have to go all the way up the driveway to get to the path to the front door. I have one last question. Is there any explanation for his DNA being found in the scene of the crime? Other than the fact that he frequented that home before because he and his wife knew the Shabbats, no. And he used to go through broken windows to get into the house? Not necessarily, Your Honor. There was testimony. Well, not necessarily? No, Your Honor. Generally speaking, no. There was a party in the Shabbat's and he may be in that area. I don't think it was necessarily a surprise. Well, I was under the impression that his DNA was found in the broken glass of the window that was used to enter the house. There was some testimony to that fact. The evidence collection technician indicated that they had swabbed an area. We presented that it was unclear as to exactly where the swab was taken from. The government submitted that the swab was taken somehow in between the two panes of glass and that's where the DNA was found. Thank you.